No. 32.—STEPHEN, (a slave,) plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant.

[1.] Under the Act of February, 1850, transferring the trial of capital offences, committed by slaves and free persons of color, to the Superior Court, Jurors are to be impannelled and sworn in the same manner, as for the trial of crimes committed by free white persons.

[2.] A count for rape, and an attempt to commit a rape by a slave, on a free white female, may be united in the same indictment. The two counts are of the same nature; they require the same plea, the same judgment, and the same *quantum* of punishment.

[3.] The proper time for the prisoner to avail himself of a misjoinder of counts, for distinct offences, and to compel an election, is when the indictment is read to the Jury. He may avail himself of the objection by demurrer, or on motion to arrest the judgment.

[4.] In general, judgment on a writ of error will follow success in the particular issue. It is proper, however, to examine the whole record, and to adjudge either for the plaintiff or defendant, according to the legal rights, as it may on the whole appear, notwithstanding, or without regard to the issue in Law, which may have been raised and decided, between the parties.

[5.] The party guilty of the first faulty pleading, cannot demand a repleader.

[6.] Where a repleader is awarded, no error ought to be left upon the record.

[7.] On an indictment for a rape, the Jury may find the accused not guilty of the offence charged, but of the attempt only, provided the evidence will warrant such finding. *Held,* that it will not vitiate the verdict, to swear the Jury to try the prisoner for the *attempt,* as well as the *rape.*

[8.] In a prosecution for a rape, the fact of the woman's having made complaint soon after the assault took place, is evidence; the *particulars* of her complaint, however, cannot be gone into, and she will not be allowed to name the prisoner, as the person who committed the injury, unless by way of *information,* to lead to his arrest.

[9.] A confession, whether made upon an official examination, or in discourse with private persons, which is obtained from a defendant, either by flattery of hope, or by the impressions of fear, *however slightly the emotion may be implanted,* IS NOT ADMISSIBLE EVIDENCE.

[10.] It is no objection to the competency of confessions, that they were made while the party was in *legal imprisonment.*

[11.] A reversal upon writ of error, cannot be claimed on the ground that the Court in its charge, referred, by way of illustration, to evidence which was not in the record, provided the Jury were referred to the testimony, and directed to examine it for themselves; and were reminded that they were the exclusive judges of the facts, irrespective of any opinion which the Court might entertain or express, respecting them.

[12.] A person who has committed an offence, may be convicted upon his own voluntary confession, although it is totally uncorroborated by any other proof.

[13.] In England, the doctrine may be considered as satisfactorily established, whatever doubts may have been expressed in this county to the contrary,

that *extra-judicial confessions*, uncorroborated by any other proof, as to the *corpus delicti*, are of themselves sufficient to convict the prisoner.

[14.] A rape may be committed on an infant.

[15.] A child under ten years of age, cannot consent to carnal intercourse, so as to rebut the presumption of force.

[16.] Will not the same presumption be made in forcing one over ten, who is still a child in stature, constitution, and physical and mental developments? *Quere?*

[17.] Every indictment is sufficiently technical in this State, which states the offence so plainly, that a man of ordinary capacity would readily understand the nature of the offence charged.

[18.] The Courts will take judicial notice of the usual abbreviations of christian names.

[19.] Upon an indictment against a slave for a rape on a free white female the verdict was, "we the Jury find the prisoner guilty of an attempt to commit a rape:" *Held*, that it was sufficiently full, and need not negative the charge of rape—*that* being the legal effect of the findings; neither was it necessary to add *on a free white female*—that being the issue submitted, the verdict is co-extensive with it.

[20.] The XLVth section of the XIVth. Division of the Penal Code, enacts, that upon the trial of an indictment for any offence, the Jury may find the accused not guilty of the offence charged in the indictment, but guilty of an attempt to commit such an offence, without any special count in the indictment for such attempt, provided the evidence before them will warrant such finding. By the Act of February, 1850, indictments against slaves and free persons of color, charged with capital offences, are to *be framed in the same manner* as indictments against free white persons. *Held*, that the same incidents follow, as to the powers of the Jury, in finding the accused guilty of the attempt.

Indictment, in Houston Superior Court. Tried before Judge Powers, October adjourned Term, 1851.

At the October adjourned Term, of Houston Superior Court, held in December, 1851, the Grand Jury found true the following bill of indictment:

"The Grand Jurors, &c. in the name and behalf of the citizens of Georgia, charge and accuse Stephen, a man slave, the property of Nunn Miller, of the County and State aforesaid, with the offence of rape; for that the said Stephen, as aforesaid, in the County aforesaid, on the 31st day of October, 1851, with force and arms, in and upon one Mary Daniel, the said

Mary Daniel being then and there, a free white female in the peace of God, and said State, then and there being, violently and feloniously did make an attempt, and her, the said Mary Daniel, the said Mary Daniel being then and there a free white female, then and there forcibly and against her will, feloniously did ravish and carnally did know, contrary to the laws of said State," &c. The indictment also contained a count for " an attempt to commit a rape."

When placed upon his trial, counsel for defendant challenged the array of Jurors, upon the ground that the Jury chosen, summoned and impannelled to try said cause, were not chosen, summoned and impannelled, under any law authorizing the drawing, summoning and impannelling of Jurors, for the trial of a slave.

The Court refused to sustain the challenge, and counsel for defendant excepted.

Counsel for defendant moved the Court to compel the Solicitor General, to elect upon which count in the indictment he would go to trial, before the same was read to the Jury. Which the Court declined to do, and counsel for defendant excepted.

The Solicitor General swore the Jury to try the issue formed upon this bill of indictment, between the State of Georgia and Stephen, a negro man slave, &c. who is charged with the offence of rape and of an attempt to commit a rape, &c.

To which counsel for defendant objected, on the ground that they were sworn to try two issues. The Court overruled the objection, and counsel for defendant excepted.

The State introduced Mrs. Mourning Daniel, the mother of Mary Daniel, who testified that immediately after the commission of the act by the defendant, Mary Daniel told her that it was Stephen who injured her.

To which evidence, counsel for defendant objected.

The Court overruled the objection, and counsel for defendant excepted.

John W. Johnson, was introduced as a witness on the part of the State, who testified as to certain admissions, (in substance,

Stephen, a slave, *vs.* The State of Georgia.

that he was guilty of the crime) made by the defendant, when in custody of the Constable.

Counsel for defendant objected to the evidence.

The Court overruled the objection, and counsel for defendant excepted.

The Court, among other things, charged the Jury, "that though the prisoner's confessions were to be received with great caution, yet if they should find that they were corroborated by any part of the evidence testified to by other witnesses, they would amount to almost positive proof, and they might look into the testimony and see if his confessions were so corroborated. For instance, if they should find his confessions (made to Johnson) in regard to having sent for Mary Daniel, (who at the time was in an adjoining field) to bring him a pin, and making out he had a splinter in his finger, agreed with a similar statement made by her to her mother, it might amount to confirmation of his confessions. The Court, however, charged the Jury, that they were judges both of the law and the facts, and that they were not to be governed by any opinion of the Court, in criminal cases, if it differed from their own opinion of the law and facts, &c.

To which counsel for defendant excepted.

The Jury returned the following verdict: "We the Jury find the prisoner guilty of an attempt to commit a rape."

Whereupon, counsel moved an arrest of judgment.

Which motion was overruled by the Court.

Counsel for defendant then moved the Court for a new trial, upon several grounds, predicated upon the various exceptions taken in the progress of the trial, and also upon the form of verdict rendered by the Jury.

The Court overruled the motion for a new trial, and counsel for defendant excepted.

HALL and GILES, for plaintiffs in error.

Sol. General DeGRAFFENREID, for defendant in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

The prisoner was indicted in the Circuit Court of Houston County, for a rape on the body of Mary Daniel. On the trial, the Jury found him guilty; and this application is to reverse the judgment of the Court.

I shall endeavor, as briefly and dispassionately as I can, to investigate the numerous points made by the record. The crime, from the very nature of it, is calculated to excite indignation in every heart; and when perpetrated by a slave on a free white female of immature mind and body, that indignation becomes greater, and is more difficult to repress. The very helplessness of the accused, however, like infancy and womanhood, appeals to our sympathy. And a controversy between the State of Georgia and *a slave* is so unequal, as of itself to divest the mind of all warmth and prejudice, and enable it to exercise its judgment in the most temperate manner.

[1.] It is insisted, in the first place, that the Jury which tried the cause, were not summoned, chosen or impannelled, under any law of force in this State, for that purpose.

It is .conceded, that unless this proceeding was authorized by the Act of February, 1850, providing for the trial by the Superior Courts, of slaves and free persons of color, charged with capital offences, that it cannot be sustained. For the Acts of 1811 and 1816, are virtually, if not directly, repealed by this late Statute, changing the forum for the trial of capital offences, committed by this class of our population. Does this Act authorize this proceeding?

In the absence of any express provision, we should have entertained no doubt whatever, that the mere transfer of jurisdiction, from the Inferior to the Superior Court, carried with it to the latter tribunal all the means necessary and proper for its exercise. But we are not left to speculate upon this subject. For the Act itself declares, that after a bill of indictment is found true, by the Grand Jury, against the slave or free person of color, that " the trial shall proceed to *rendition of verdict*, in conformity

with the provisions of the Penal Code; and in case of conviction, the Judge shall pass sentence," &c. *New Digest*, 1019.

No argument or illustration could make the point plainer. The Juries for the trial of capital offences committed by slaves or free persons of color, are to be summoned, impannelled and sworn, in the same manner as are those for the trial of like crimes committed by free white citizens.

[2.] The next complaint is, that the Court overruled the motion made by the counsel of the prisoner, to compel the State's attorney to elect on which count in the indictment he would try the prisoner, before *swearing the Jury and charging them with the case.*

The indictment, as originally framed and found, contained two counts, one for rape, and the other for an assault with intent to commit a rape.

[3.] The prisoner might have availed himself of the objection upon demurrer to the indictment, or on a motion in arrest of judgment. The first application was made before a single Juror had been sworn, and it was repeated before the indictment was read. The Court very properly held, there being no demurrer filed to the form of the indictment, that it was not as yet judicially advised, that there were two counts in the indictment, and could not be, until it was read. And it might have added, that the Solicitor General might, *ex mero motu*, make the election. The motion was ultimately sustained, and the State elected to try on the first count.

Another view of this question, makes it equally conclusive to my mind against the plaintiff in error. In this case we are clear, that the defendant had no right to force an election. For the two offences charged in the indictment, being of the same nature, requiring the same plea, the same judgment, and the same quantum of punishment, the State might have proceeded to trial on both counts at the same time.

[4.] Admitting then, that the Judge committed a mistake in law, in not entertaining the motion at an earlier stage of the trial, still upon an examination of the whole record, finding as we do, that the second count in the indictment should not have been

stricken out at all, we should adjudge for the State, the legal right upon the whole case being with the State. If the second count ought to have been permitted to stand, then it was no error in the Court to refuse to strike it out at any stage of the trial.

[5.] The party guilty of the first faulty pleading cannot demand a repleader. 1 *Chitty's Pl.* 694. *Stephens on Pl.* 120. *Walker vs. Walker,* 1 *Wash.* (*Va.*) 135. *Shelton vs. Pollock,* 1 *Hen. & Munf.* 427. *Hill vs. Harvey,* 2 *Munf.* 525, *and the cases in the note. Green vs. Bailey,* 5 *Munf.* 251.

And admitting there is error in the particular exception, the judgment will not be reversed, if it appear distinctly upon the whole record, that the prevailing party was entitled to succeed. *Haughton vs. Sleuk,* 10 *Vermt. Rep.* 520.

The object of a proceeding in error is to reach the judgment, and to avoid it, when it does not possess the elements upon which alone all judgments should stand. But a Court will never set aside a judgment, because error may have been committed upon some particular point, where an examination of the whole record conclusively shows, that the judgment was correctly rendered. *Ottin Harman vs. Kelly, Payne and others,* 14 *Ohio Rep.* 502.

Another familiar rule is, that an appellate Court will not reverse a judgment, where it is clear, from the entire record, that the plaintiff in error never can recover. *Rogers vs. McDill & Campbell,* 9 *Geo. Rep.* 506. 4 *Ala. Brock vs. Yongue,* 584.

[6.] Where a repleading is awarded, no error ought to be left upon the record. *Kempe vs. Crews,* 1 *Ld. Raymond,* 169. *Cowper,* 510.

[7.] It is next objected that the Jury that tried the cause was not legally sworn.

Each of the Jurors was sworn, " well and truly to try the issue found upon the bill of indictment between the State of Georgia and Stephen, a man slave, the property of Nunn Miller, who was charged *with the offence of rape and an attempt to commit a rape,* and a true verdict to give according to evidence."

The issue submitted was rape or no rape; and *that,* the Jury

were sworn to try. They did, it is true, under this issue, find the prisoner guilty of *an attempt*. And holding as we do, that it was competent for the Jury to render such a verdict, we cannot see, why the fact that they were sworn to try him for *the attempt*, as well as *the act itself*, should vitiate the verdict.

[8.] In relation to that portion of the testimony of Mourning M. Daniel, the. mother of the girl, in which she stated, that when her daughter complained to her of the injury done her, she said, " it was Stephen that hurt her," we find it somewhat difficult, upon principle, to sanction its admission. The general rule deducible from the books, seems to be that in a prosecution for a rape, the fact of the woman's having made complaint, soon after the assault took place, is evidence; and that the *particulars* of her complaint cannot be gone into. *Roscoe on Crim. Ev.* 23. By the laws of Scotland, the particulars of such declarations, when made *de recenti*, are received. But this privilege is extended to those accounts only which are connected more or less directly with the *res gestæ* of the injury; or which were so recently given after it, as to form, in some sort, a sequel to the actual violence. (*Id.*)

If this statement of the girl was uncorroborated by other proof, we should send this case back. If the identity of the offender was a debateable question, and there was a conflict of testimony respecting it, we should be unwilling to see the prisoner suffer a felon's death, however richly he may deserve it. But that the violence inflicted was done by Stephen, he never denied, but freely admitted, and all the proof points that way. The only effect of this statement was to lead to the arrest of the prisoner; and in that view of it, perhaps, it was not altogether objectionable.

[9.] Another assignment is, that the Court erred in admitting the confessions of prisoner, testified to by John W. Johnson—the same, as it is alleged, having been extorted by duress and the excitement of hope and fear.

Mr. Johnson testified that the Constable having the custody of Stephen, left him temporarily in his charge, and that, during his absence, the prisoner commenced conversing about the case, and

said that, " he was very sorry that he had done as he had, and that had it not been for Anthony (another slave) he should not have acted so." Witness cautioned prisoner to be careful how he talked, for that it might cost him his life. He then asked him if the charge was true? He said, " Yes, but Anthony caused him to do it." He stated, " that he had heard, that if a girl was not large enough, that to tie something around her waist, would make her big enough. Mary did not make much objection to having the handkerchief tied around her, but when it came to throwing her down on the ground, she objected and struggled." He said, " he did not succeed in accomplishing his ends, she was too small." He said, " the devil had induced him to do it." The confession was made by the side of Moreland's store house, at Hayneville. The boy was chained at the time. He stated further, " he sent for the girl to bring him a pin, making out that he had a splinter in his finger, and in that way he got hold of her. She was picking cotton on one side of the fence, and he at work on the other." Witness, at the outset, advised the prisoner not to confess, and exhorted him to tell the truth if he said any thing.

[10.] We see nothing which would require these confessions to be excluded ; no threats or promises, or improper contrivances of any kind, were used to influence the prisoner to make them. He spontaneously acknowledged his guilt, and designated Anthony as having instigated him to do the deed, before a word was spoken to him by Mr. Johnson. And then he was solemnly warned of the fatal consequences which might result to himself, from the disclosures which he might make.

It has been forcibly and truly urged that the human mind, under the pressure of calamity, is easily seduced, and is liable, in the alarm of danger, to acknowledge indiscriminately a falsehood or a truth, as different agitations may prevail ; and hence the humane rule of evidence, that a confession, whether made upon an official examination or in discourse with private persons, which is obtained from a defendant, either by the flattery of hope or by the impressions of fear, *however slightly the emotion may be implanted*, IS NOT ADMISSIBLE EVIDENCE. For the law

will not suffer a prisoner to be made the deluded instrument of his own conviction.

· But here the officer who made the arrest had retired to administer some medicine, leaving Stephen in the charge of Mr. Johnson, and in the public village and immediate neighborhood no doubt of sundry persons, where coercion could not have been used without attracting attention; with his mind as much at ease, as any one's could be, under the circumstances, he makes the minute statement which I have detailed, most of which is fully confirmed by the other proof, and which I must say, carries upon its very face, a probability which leaves but little room to doubt its truthfulness.

For myself, 1 concur fully with Mr. Phillips, that the cases are probably rare, in which unfounded self-accusations occur, or at least where a Jury would be misled by them; and that the rule which excludes confessions, has been extended quite far enough, and applied in cases where there could be no reasonable ground for supposing that the inducement offered to the prisoner was sufficient to overcome the strong and universal motive of self-preservation. *Treatise on Evidence*, 424.

In Scotland, all confessions are admissible, leaving their credit with the Jury. 2 *Allison's Crim. Law of Scotland*, 581, 582. And I am not prepared to say, that this is not the better practice.

[11.] Another reason for reversal is, that the Court charged the Jury, "that though the prisoner's confessions were to be received with great caution, yet if they should find that they were corroborated by any part of the evidence, testified to by other witnesses, they would amount to almost positive proof; and they might look into the testimony and see if they were so corroborated. For instance, if they should find his confessions in regard to having sent for Mary Daniel to bring him a pin, and making out he had a splinter in his finger, agreed with a similar statement made by her to her mother, it might amount to confirmation of his confessions. The Court, however, charged the Jury, that they were judges both of the law and of the facts,

and that they were not to be governed by any opinion of the Court."

The complaint is, that the Court predicated its charge upon testimony which did not exist; that it did not appear that Mary Daniel had made any such statement to her mother, respecting the pin and the splinter, as that which was related by the prisoner to Mr. Johnson. Grant this to be true, and what is the consequence? Why, that not finding this confession thus corroborated by the statement of the girl to her mother, so far from the confessions of the prisoner being confirmed, they would be weakened, for want of this corroboration. They would have to stand upon their own naked strength. The defendant, therefore, could not have been injured by these instructions, more especially as the Jury were directed and encouraged to examine the testimony for themselves, and were reminded, that they were the judges in the last resort in criminal cases, both of the law and the facts, and that they should not be biassed by any opinion which the Court might give.

[12.] We come now to an important point. It is alleged that the verdict is not only contrary to law, but unsupported by any legal and sufficient evidence to warrant the finding.

Having already decided that the confessions of the prisoner were properly admitted, the force of this objection would seem to be entirely obviated; for if the prisoner spoke the truth, he is guilty beyond a reasonable doubt.

But it is argued with great earnestness and ability, that confessions are the weakest of all evidence, and should always be received with suspicion; that words are often misreported, through ignorance, inattention or malice; and that at best, they are extremely liable to misconstruction; moreover, that this species of evidence is not, in the usual course of things, to be disproved by that sort of negative evidence, by which the proof of plain facts, may be, and often is, confronted.

And this course of reasoning is sanctioned by high authority. *Foster's Discourses,* 243. Approved by *Sir W. Blackstone,* 4 *Com.* 357.

And it cannot be doubted that innocent persons have con-

fessed themselves guilty of crimes of the gravest nature.   1 *Leach*, 264, (*note.*)

Still the rule of criminal evidence remains unimpeached, that a person who has committed an offence may be convicted upon his own voluntary confession, although it is totally uncorroborated by any other proof.   2 *Stark. Ev.* 53.   *Chitty's Crim. Law*, 570.   *Hone's Case, Dyer*, 214.   *Francis' C. C. H. W.* 58. *Fisher's Case, Leach C. C. L.* 3d edit. 349.   *Wheeling's Case*, *Ib.*   *Hawk. b.* 2 *c.* 46, §39.   *Eldridge's Case, Russ. & Ry.* 440. 1 *Phil.* 80.

[13.] And notwithstanding doubts have been expressed by American writers, whether *extra-judicial confessions, uncorroborated* by any  other proof of  the *corpus delicti*, are of themselves sufficient to convict  the prisoner, yet I apprehend, that the doctrine may be considered as having  been satisfactorily established in England.   Such was the opinion  of the *twelve Judges*, on an indictment for robbery, where the person robbed did not  appear at the trial.   *Falkner & Bond's Case, Russ. & Ry.* 481.   See also, *White's Case, Ib.* 508 ; *and Lippet's Case, Ib.* 509.

But passing by the contrariety of opinion upon this point, is there, I ask, no corroborating circumstance as to the *corpus delicti* in this case?   To corroborate, is to strengthen—to confirm by additional proof.   Do not the facts stated  by the prisoner comport with facts  otherwise known and  established?   Is not his account of the treatment of the little  girl, and the cause of his failure, rendered more  probable, by  the evidence  of other witnesses?

Both of the parents testify that there were marks of great violence and abuse upon her person, having no earthly doubt as to the nature and extent of the injury  she had suffered.   I forbear to detail the facts ; they are spread out in the bill of exceptions. She seemed, upon returning, just at night, hurriedly home, to be alarmed and in the deepest distress.   From appearances, the injury had just been inflicted.   Three large holes were cut in her dress ; she and the negro were  at work near each other, in adjoining fields, with a fence between.   That her person had been violated, is not  disputed, and every appearance indicated that it

was forcible and against her will; I repeat that these facts corroborate, in a striking and remarkable manner, the confessions as proved.

But suppose it were otherwise, I should hesitate long before I could get my consent to let the prisoner escape.

[14.] Anciently it was doubted, whether a rape could be committed upon a child under ten years of age. And therefore the Act of 18 *Elizabeth, ch.* 7, §4, was passed. The authorities going to show that a rape, at Common Law, could be committed on a female under ten years, considered it immaterial whether she consented or not.

[15.] The Common Law principle is, that a child under ten years of age is incapable of consenting. The same construction has been put upon the Statute of *Elizabeth.* Hence Lord *Hale* defines rape to be, the carnal knowledge of any woman above the age of ten years, against her will, and of a woman's child under the age of ten years, *with or against* her will. 1 *Hale, P. C.* 628.

[16.] Now, it will be readily perceived, that the period of ten years designated here is altogether arbitrary. There is, and from the very nature of the case can be, no definite time fixed by law, to infer puberty. It depends more upon the constitution and habits of body of the party, than upon age. In cities these developments are made earlier than in the country; there females are often found living in a state of open prostitution, at the early age of 12 or 13 years.

The law, to be sure, has said, by implication at least, that where consent is given, after ten years of age, a rape cannot exist. But this, after all, is a mere presumption, and may be rebutted. Has it not been overcome by sufficient evidence in the present case?

The parents testify that their daughter is sickly and weakly, and poorly grown. Her mother swears that she is nothing but a child; that she had never had her monthly courses; and that there was no appearance of womanhood about her. Is this "weak-minded" creature, as she is shown to be, and on which account partly, she was not brought as a witness upon the stand, capable of consenting to such a deed? Could she have sought

her own gratification? As well pretend that the infant is lustful in its cradle. There may be, and doubtless are, extraordinary instances of the early birth of the passions; but this poor creature is not one of them. It would ill-become her to play the wanton; her physical condition, if not her tender age, rendered lewdness with her, an impossibility.

In view then of her condition, both as to body and mind, why was she not as incapable of consenting, as females of ten years of age and younger are, ordinarily? Like all other children, she lacked the instinctive intelligence to comprehend the nature and consequences of this atrocious act—to reason upon duty—to distinguish, morally and legally, between right and wrong—to have the consciousness of guilt and innocence clearly manifested.

I would not put common seduction upon the same footing, and confound it with rape. In the present case, however, the consequences are pretty much the same to the unhappy victim, her family and friends, and to society at large. Over her and them, the defendant's unhallowed lust, has thrown a dark cloud, which will hang over them forever. The entrance of sin into this lower world, has brought no sorrow like this. But believing, as I do, from the evidence, that the passions of this girl had not arrived to that maturity, to authorize a supposition of a sexual connection, *with her consent,* and seeing that her person has been most shamefully outraged; I would, were I in the Jury-box, sieze upon the slightest proof of resistance—notwithstanding she may have been enticed to give her consent, in the first instance—even the usual struggles of a modest maiden, young and inexperienced in such mysteries, to find, in just such a case, that the act was against her will, and that the presumption of law was so strong, as to amount to proof of force.

[17.] The next objection is, that the indictment does not sufficiently charge the defendant with any crime of which a slave can be convicted. That it charges him with the offence of committing a rape, whereas it should have charged him with the offence of committing a rape upon a free white female.

Will the age of technicalities never pass away? Shall the law, affecting the dearest interests of men, their property, life and char-

acter, " coming home to their businesses and bosoms," never become a popular science?

The Legislature, in 1833, declared that every indictment or accusation, should be deemed sufficiently technical and correct, although in omitting *fictions, repetitions and technicalities*, it left a hole in *Chitty's & Archbold's Old Forms*, large enough for a loaded cart and horse to pass through, provided it stated the offence in the terms and language of the Code, *or so plainly*—(what a pregnant clause!) that the nature of the offence charged, might be easily understood by the Jury.

What does this indictment set forth? " That the Grand Jurors, whose names are there recorded, sworn, chosen and selected for the County of Houston, in the name and behalf of the citizens of Georgia, charge and accuse Stephen, a man slave, the property of Nunn Miller, of the County and State aforesaid, with the offence of rape. For that the said Stephen, on the thirty-first day of October, in the year eighteen hundred and fifty one, with force and arms, in and upon one Mary Daniel, *being then and there, a free white female*(?) in the peace of God, and said State, then and there being, violently and feloniously, did make an attempt, and her the said Mary Daniel, *the said Mary Daniel being then and there a free white female,* then and there forcibly, and against her will, feloniously did ravish, and carnally did know, contrary to the laws of said State, the good order, peace and dignity thereof."

The indictment, if defective at all, is so on account of its redundancy. It needed pruning instead of enlarging. There is *too much* in it, rather than *too little*. It is twice alleged, that Mary Daniel is *a free white female.* What man of rational understanding could fail to comprehend the offence for which this negro was prosecuted? *and this alone is the criterion of sufficiency.*

[18.] The next objection is of a similar character. It is that only seventeen Grand Jurors have found the bill, there being only that many names written out in full in the body of the indictment, one of them being written thus: Jas. W. Belvin.

*In Studstill vs. The State,* (7 *Geo. Rep.* 2,) this Court held,

that the abbreviation *Thos.* for *Thomas*, in the name of the fore-man of the Grand Jury, indorsed upon the back of the indict-ment, and written in full in the body of it, was no variance; that is, they were the same name.

*In Fenton vs. Perkins*, (3 *Missouri Rep.* 106,) the Supreme Court held, that the abbreviations of names—given names, were so common, that without any violence to the laws of the land, the Courts may take judicial notice of them; and such is our judgment.

[19.] An objection was taken to the form of the verdict, that it does not, with sufficient certainty, find the prisoner guilty of any offence, for which a slave can be capitally or otherwise convict-ed. The verdict is, "we the Jury find the prisoner guilty of an attempt to commit a rape." John W. Cress, foreman.

It is contended that the verdict is not full enough; that it should in the first place have negatived the charge of rape, and gone further and found the attempt to have been upon a free white female.

Under an indictment for murder, the Jury may find a verdict for manslaughter, either voluntary or involuntary. But it has never been the practice for the Jury to negative, by their verdict, the charge of murder. It might be well enough, perhaps, for the Court, in rendering judgment upon such a finding, to pronounce a judgment of acquittal for the higher offence; for such we apprehend to be the legal interpretation of the verdict. The ob-jection, if good at all, therefore, and we do not say that it is, should have been to the judgment of the Court, and not to the verdict of the Jury. The State puts the prisoner upon his trial for rape, and not having exhibited evidence sufficient to convict him of this offence, the Jury found him guilty of the attempt. He is consequently entitled to a judgment of acquittal as to the rape.

As to the form of the verdict, it appears to us, to be sufficient-ly full. The Jury found the defendant guilty of an attempt to commit a rape. What rape? Of course that charged in the in-dictment, on Mary Daniel, a free white female.

[20.] The only remaining point is this: rape, and an attempt

**VOL XI 31**

Stephen, a slave, *vs.* The State of Georgia.

to commit a rape, by a slave or free person of color, upon a free white female, are both capitally punished by the laws of this State. It is argued, that these are distinct offences, and that they must be separately prosecuted, and that the XLVth section of the XIVth division of the Code, which provides, that upon the trial of an indictment for any offence, the Jury may find the accused not guilty of the offence charged in the indictment, but guilty of an attempt to commit such an offence, without any special count in said indictment for such attempt, provided the evidence before them will warrant such finding—applies to offences committed by free white persons, and not to such as may be committed by persons of color.

And the proposition, as thus stated, is certainly true. The Penal Code was not intended to apply to slaves or free persons of color, in any of its enactments, unless they are expressly mentioned.

But the Act of February, 1850, which has heretofore been cited, makes it the duty of the Solicitor General, *to frame* and send before the Grand Jury, bills of indictment against colored persons charged with capital crimes, in the same manner as in cases of free white persons—the Act obviously designing to place both in all respects upon the same footing.

Under the Code, a free white person could be indicted for a rape and convicted of the attempt, without any count for the attempt. And now the indictment against the slave or free person of color, *is to be framed in the same manner,* of course the same incidents must attach to each.

Being satisfied that the errors assigned are not sufficient to arrest the judgment, and save the accused from the consequences of his crime, he must be left to abide the penalty of that awful sentence, which adjudges him to be unworthy to have a place longer among the living.