1. Carnal knowledge of an imbecile female, who is mentally incapable of giving an intelligent assent or dissent and to exercise judgment, constitutes rape. The evidence was sufficient under this legal test to authorize the verdict of guilty. *Page 345 
2. It was not error to deny counsel for the defendant, while cross-examining the blind father of the injured female, who had testified concerning her attendance in school, the right to read in the hearing of the jury the contents of a certified copy of the county-school record of such female, it not appearing that the witness had ever had knowledge of the contents or even the existence of such a record, and such record not having been introduced in evidence.
 No. 15179. JUNE 5, 1945.
Jim Whitaker was convicted of the offense of rape with recommendation of mercy, and his sentence was fixed at fifteen years' imprisonment. He excepts to the judgment overruling his motion for new trial.
The State's evidence showed that the alleged victim, Anne Hitchcock, was a girl 19 years of age, infirm physically and mentally. Her family, with whom she resided, consisted of a blind father, two brothers who were serving with the armed forces of the United States, and a sister Rebecca several years older than Anne. Her mother died a number of years ago, and her sister and father have looked after her since that time. Her family had resided in Milledgeville less than a year, having moved there from Hancock County, where the father had lived all his life, and both the father and the older sister were regularly employed at public work in Baldwin County, and they kept a colored woman in the home to look after Anne during their absence. The defendant lived on the same street, only two doors away, and the father and the defendant had had business transactions with each other, had been close friends, and each had at different times gone to the home of the other and engaged in friendly conversation. Anne had been physically and mentally incapable of taking care of herself throughout her life. She had gone to school through the seventh grade; but she had been advanced by her teachers, despite her failure to do the work satisfactorily, in order that she might have the companionship of the same children, and because she would never be able to go farther in school.
Mrs. Grace Underwood lived with her husband in one side of the house occupied by the Hitchcock family. Mrs. Underwood is a niece of Mr. Hitchcock. She worked at the naval ordinance plant, and was at the house during the times when Rebecca and Mr. Hitchcock *Page 346 
were working. On September 20, 1944, she was at home and received a report with regard to where Anne was. Anne had never left the house by herself before. Mrs. Underwood went to the defendant's house, which was two door away, and there found Anne and the defendant lying on a bed together. She saw no one else there. The door was nearly closed, but open enough for her to see through the opening. She called Anne and carried her back home. She called Anne's sister Rebecca home from work. The defendant went down where she and Rebecca were. He went voluntarily. He threw his deeds, or some papers that he said were deeds, down on the floor and offered them to Rebecca to settle the thing. He stated that he thought he had gotten Anne pregnant, that something was wrong with her, and he was the guilty one. He guessed he was. He tried to get her to take some medicine but she did not want it.
Anne said in his presence that his intercourse with her took place at her house. He got down on his knees and offered to marry her. Both Mrs. Underwood and Rebecca Hitchcock testified to this conversation of the defendant. He said that the intercourse with the girl happened in Baldwin County. The father, the sister, and Mrs. Underwood all testified that Anne had the mentality of a child of only eight to ten years of age.
The State's evidence showed that Anne was infirm physically, that she did not have muscular co-ordination, that she could not walk well, and that her arms "sort of hang by her."
Dr. C. E. Fulghum testified that he had occasion to observe Anne about four times. He was a diagnostician of physical ailments, was not a psychiatrist, and neither diagnosed nor prescribed for mental ailments. He examined Anne with reference to her physical and mental condition, and from this examination he found that she was not normal physically or mentally, and that "physically my opinion is that she reports a birth injury, that is, that her physical condition is the result of a birth injury, and that she is underdeveloped in the field of muscular development and muscular co-ordination, probably because of birth injury," and that "mentally she appears to be a medium-grade moron. Comparing her to some age of a child, I would assume her mentally to be between 8 and 10." He testified that he examined her and found that she was pregnant. *Page 347 
Three physicians advised an abortion because Anne's physical condition indicated that she could not have a child, and this was done.
Anne, the alleged victim, was in court and testified, her entire testimony being as follows: "My name is Anne Hitchcock. My papa is John Hitchcock. My brother is not here. My sister Rebecca is here. I don't know whether I have ever had any sweet-hearts. I know Mr. Jim Whitaker. He is here. He came over to see me while my papa and them was away. He had something to do with me over at my house. I don't know whether that was right or wrong. I am 19 years old. I haven't been going to church; don't ever go to church. I go to Sunday School sometimes. I went to Sunday School out at Devereux. I never went to Sunday School here in Milledgeville. I have been to church at Devereux sometimes. I went with my sister and father. I went to school. I went to school seven years. I did not finish school, did not go to high school. When I was going to school I wrote up papers to give to my teacher next day. I would do that at night so I would have them ready to hand to my teacher next morning. I can write a little bit, not much. I don't know whether it is wrong for anybody to steal. I know it would not be right to steal anything. I know it is wrong to use bad words. I don't know whether I know that people ought to be good and go to church and do right. I don't know where people that steal go when they die. I reckon people that do wrong don't go to Heaven when they die. I reckon they go to the other place. They taught me that when I went to Sunday School. I reckon it would be wrong to tell my teacher or father anything that was not so. It has been a long time since I have been to Sunday School. I went down to Mr. Whitaker's house one day. That is when Mrs. Underwood came down and got me. I went back home with her. I and Mr. Whitaker were just in the room there lying across the bed. We were just talking, not doing anything except he and I were just in there talking. I don't know whether I have been out to ice-cream suppers. I have been to ride with people in an automobile one or two times. I don't know whether I know Miss Frances Johnson. I haven't been knowing Mr. Whitaker seven months. When I went to school I played with the other children. I liked to go to school sometimes, and sometimes I didn't. I don't know whether the teachers made *Page 348 
me study hard. I don't know whether I took my books home with me at night and studied. Sometimes the teacher had me go to the blackboard and wrote. I know when you go to the blackboard and work out arithmetic. I did not work it for them. They gave me something too hard for me. I held up my hand a while ago when the solicitor had me up here. I held up my hand to tell the truth. I don't know why Mr. Baldwin told me to hold up my hand. I held it up. That was to tell the truth. I know it is wrong not to tell the truth. I don't know that I know what happens to people if they die and don't tell the truth. I don't know what an oath is. I held up my hand to tell the truth, but I don't know what an oath is."
The defendant made a statement, opening with the sentence: "Gentlemen of the jury, I don't know very much about this case of rape business. It was a surprise to me." He related an experience of his on the night of September 20th, when he was attacked by Hitchcock, the father of the alleged victim, and about which the father had already testified. Referring to the testimony of Mrs. Underwood and Rebecca, he stated that George Peanut, Pal Mitchell, and Anne came to his house, that he was lying across the bed and the front door was propped open, that he was a poor man. shacking in the house and eating up town. He had no wife. Mrs. Underwood knocked on the door and called Anne. He asked her in, but he would never ask another one of them in as long as he lived. Mrs. Underwood said, "What in the world, Anne, are you doing here?" "Said, `We were just in her talking.'" He stated that Anne was lying on the bed with him. Anne got up and Mrs. Underwood told him to come up there, Mr. Hitchcock had to do something about Anne being down there. "It scared the dickens out of me. I know the girl was uninformed, was not like she ought to be, I knew that." He got up and "kind of washed [his] face and hands and walked up there." Rebecca asked him what Anne was doing down there, and he replied, "God in Heaven knows. I don't know what she was doing down there." He stated that he had never raped or been with the girl. That was the first he had heard of it, and Hitchcock ran the negroes off and beat them. The negro did not know anything about it and did not have anything to do with it. *Page 349 
One special ground of the motion for new trial complains of the ruling which prohibited counsel for the defendant, while cross-examining J. L. Hitchcock, the blind father, from reading to the witness the contents of a certified copy of the school report of Anne Hitchcock. The father had testified that he knew Anne better than anyone else, and that he hardly knew what to say as to her physical and mental condition, and that it was probably correct that she entered the second grade in the fall of 1937. He remembered the report card but did not remember what it was. Counsel for the State and the defendant had previously agreed that this school copy of the school report, certified by the county school superintendent, might be introduced in evidence by the defendant without requiring the presence of the school superintendent and without objection. It was never introduced in evidence.
1. "Rape is the carnal knowledge of a female forcibly and against her will." Code, § 26-1301. In the present case, the evidence unquestionably authorized the jury to find that the accused had had carnal knowledge of the named female. There was no evidence whatever that he employed physical force or coercion in accomplishing the intercourse. The conviction can be upheld only upon the theory of the State upon which the prosecution was planted, to the effect that the female was mentally incompetent to give an intelligent assent to the act of intercourse. "The test of mental capacity under this rule is whether she was capable or incapable of giving consent or of exercising any judgment in the matter." Gore v. State, 119 Ga. 418, 420
(46 S.E. 671, 100 Am. St. R. 182). It was further stated in the cited case that, "In the case of rape of an idiot or lunatic, the mere proof of connection will not warrant the case being left to the jury. There must be some evidence that it was without her consent, e. g., that she was incapable from imbecility of expressing assent or dissent; and if she consent from mere animal passion, it is not rape." In an earlier case, this court, speaking on the question now under consideration, said: "Like all other children, she lacked the instinctive intelligence to comprehend the nature and consequences of this atrocious act — to reason *Page 350 
upon duty — to distinguish, morally and legally, between right and wrong — to have the consciousness of guilt and innocence clearly manifested." Stephen v. State, 11 Ga. 225, 239. It is apparent that the jury alone, under proper legal instructions from the court, by a consideration of all the evidence can determine whether or not such a female is mentally capable of giving such assent as the law requires to be shown. As was pointed out in the Gore case, the appearance of the female before the jury and the trial judge supplied them with information touching the mentality of the girl which the printed record before this court does not and can not present to us. Sexual intercourse with an imbecile female, who is incapable of giving an intelligent assent or dissent or of exercising judgment in the matter, constitutes rape. Gore v. State, supra;Brown v. State, 138 Ga. 814 (76 S.E. 379); Smith v.State, 161 Ga. 421 (131 S.E. 163) Mitchell v. State,190 Ga. 571 (9 S.E.2d 892). The evidence in this record was sufficient to authorize the verdict, and the general grounds of the motion for new trial are without merit.
2. Under the provisions of the Code, § 38-1707, a witness may refer to a written memorandum for the purpose of refreshing his memory, provided he finally shall speak from his recollection thus refreshed or shall be willing to swear positively from the paper. The obvious purpose of this statute is to allow proper and legitimate aid to a witness which will enable him to testify fully as to his knowledge. Illegal evidence must not be allowed to reach the jury on the pretense that it is offered in compliance with this statute. The law must not be made a back door through which inadmissible evidence is allowed to reach the jury. The special ground of the motion complains of the ruling of the court prohibiting counsel for the defendant, while cross-examining the blind father of the injured female, from reading the contents of a certified copy of the school record of such female. It was not shown that the witness had ever seen or heard read or even knew of the existence of such a record. He had testified that he had known but did not remember the grades appearing on the girl's report card, but had not attempted to say what the county-school records showed on that subject. It appears further that prior to the trial the solicitor-general had agreed with counsel for the defendant that such counsel might introduce in evidence without objection a certified copy of *Page 351 
the school record here involved. Any bona fide desire to supply the jury with the information it contained would have been fully satisfied by the introduction of such document in evidence. It was not so introduced. It would appear, therefore, that in the judgment of counsel for the accused the contents of the document were not evidence beneficial to the defendant. The court did not err in the ruling complained of.
Judgment affirmed. Bell, C. J., Jenkins, P. J., Atkinson andWyatt, JJ., concur.