SMITH *vs.* THE STATE OF GEORGIA.

1. In a prosecution for assault with intent to rape, where a letter from the woman alleged to have been assaulted to the defendant, written after the alleged assault, was offered in evidence to rebut the testimony of the woman, and it was shown by a witness that a letter was delivered by her to him, to be carried and given to the defendant, with instructions that no one else was to see it; that he did so deliver it; that at the time the defendant read a part of it to him; that the witness was illiterate and could not read, but saw a blot upon a certain portion of the writing which enabled him to identify it; and that, from the signs and marks upon the letter offered in court, he was of opinion that it was the same letter handed to him by the woman to be delivered to the defendant, this was sufficient proof to carry the letter to the jury, inde-

pendent of any proof that it was in the handwriting of the woman, although she denied any knowledge of or connection with the transaction. The weight of such evidence was a question for the jury.

(*a.*) In the absence of direct evidence of the execution of a paper, it is admissible to resort to proof of the handwriting of the party from whom it purports to emanate; and in that case, any witness is competent to testify as to his belief, who will swear that he knows or recognizes the handwriting, but the source of his knowledge is a question for investigation and goes entirely to the weight and credit of his evidence. In this case, there was sufficient proof of execution to admit the letter in evidence, proof of handwriting being admissible either in corroboration or contradiction of the testimony concerning the letter.

(*b.*) *Semble* that, where two other letters, purporting to come from the same source as the first, were shown to experts, who compared them with the first letter and testified that they were of the opinion that the letters were all in the same handwriting, this was sufficient to admit them in evidence.

2. The verdict finding the defendant guilty in this case was contrary to law and the evidence.

(*a.*) From the peculiar character of cases of rape and assault with intent to rape, care is to be used with regard to them. The injured female is usually a competent witness, but it is generally laid down that the degree of credit to be given to her evidence depends, more or less, upon the concurrence of circumstances with her testimony; for instance, if she be of good fame, if she presently discovered the offence, made pursuit after the offender, and showed circumstances and signs of the injury, if the place where the fact was done was remote from people, inhabitants or passengers, or if the offender fled,—these and the like are concurring evidences which give greater probability to her evidence when proved by others than herself. But if she concealed the injury for any considerable length of time after she had an opportunity to complain, if the place where the fact was supposed to be committed were near to inhabitants or places of common recourse or passage, and she made no outcry when the fact was supposed to be done, when and where it is probable that she might be heard by others, these and the like circumstances carry a strong presumption that her testimony is false or feigned.

October 12, 1886.

Evidence.    Criminal Law.    Rape.    Verdict.    Before Judge RICHARD H. CLARK.    Fulton Superior Court.    September Term, 1885.

Charles K. Smith was indicted for assault with intent to rape, charged to have been committed upon Mrs. John T. Elliott. The testimony is sufficiently stated in the second division of the decision. The defendant was found guilty and recommended to mercy. He moved for a new trial on the following among other grounds:

(1.) Because the verdict was contrary to law and evidence.

(2.) Because the court rejected, when offered in evidence, a letter addressed to the defendant and signed "Lou Elliott," it having been identified by one Latham, a witness for the State, as the original letter received by him from the hands of Mrs. Elliott, and delivered to the defendant. This letter was dated September 6, 1885, addressed the defendant as "Dear Friend," stated the desire of the writer to see him and have a talk with him; also that she would do what she said she would, regardless of what other people said, and that "I told you I was made to do what I have done."—The witness, Ace Latham, testified that Mrs. Elliott gave him a note or letter enclosed in an envelope to deliver to the defendant, which he did; that when the defendant opened it, he read a few lines of it to the witness, and showed him a blot about five lines from the bottom of the letter, having the appearance of two small words run together. The letter and envelope were handed to the witness, and he was asked to identify them. He replied that he could not read, but that they looked like the same that defendant had showed him; that the blot or blur on the letter tendered to him looked like the one he had seen before; that they seemed, from their looks, to be the same papers, though they might be copied from them. Counsel for the defendant asked that the jury be directed to retire in order that the letter might be read to the witness to see whether or not he recognized the contents to be the same as that which the defendant read to him. The court replied, "Just consider it done, and that he says it is; still it is not identified; it is too dangerous

to let letters in by the sound to a man who cannot read," and rejected the evidence.

(3.) Because the court rejected two letters addressed to the defendant and signed by "Lou Elliott," sworn to have been in the same handwriting as that in the preceding ground. Walter L. Venable, as a witness for the State, testified that he did not put himself up as an expert, but thought he was a good judge of handwriting; that he had seen a good many handwritings in his life, had been a deputy in the office of the clerk of the superior court, had been a close observer, had done a good deal of copying, and from his experience thought he could judge of handwriting. Being shown the three letters, he testified that he thought they all were in the same handwriting, as also were the addresses on the envelopes. The defendant claimed to have received these letters by mail. One was as follows:

"ATLANTA, GA., Fulton county, Sept. 24, 1884.

"DEAR CHARLIE—I will write you a few lines to let you know how I stood. I am the same as ever. I am sorry things are as they are, Charlie; what I told Tom last spring, I told it to keep him from thinking anything about your being there that day, but when I told him that, he went and struck you, and then him and pa made me go to court and swear it; but, Charlie, I can't stand it any longer. I want to see you, Charlie. I will go with you yet where we said; you know where, Charlie. Tom he went on at me till I had to tell him something, and I did not know what to tell him, so I told him that. So I thought there would be no more of it, but when Tom hit you, he made me swear it. Charlie, I would love to see you; I want to have a talk with you before court, for I know if I would get to see you and have a talk with you, I know that I would not have to go to court any more; but, Charlie, I am afraid that Tom and pa will make me go to court. Charlie, if you can get any chance, I want to see you. You know what I told you; I will stick to every word of it. I think as much of you as I ever did. So I will close for this time, as true as ever until death.                   Lou ELLIOTT."

The other was as follows:

"ATLANTA, GA., Fulton county, October 5, 1884.

"DEAR CHARLIE—I wrote you a few lines the other day. I have not got to see you yet; you surely did not get my letter; if you had, I know you would have come to see me. Charlie, I wrote to you in

the other letter how I stood.  I am myself the same to you as I ever was; what I have done I was forced to do it; so don't think hard of me, and come over here, if you can get a chance, and we can fix it all right.  Charlie, pa and Tom made me go before the grand jury, and I could not help it.  I mailed you a letter that morning.  I don't see why you did not get it, for I know if you had 'a got it you would 'a come over here.  Charlie, if you get this, I want to see you as soon as you get it, for it ain't long.  I don't want to go back to court any more. I know if I could get to see you, I would not have to go to court any more.  Charlie, I will have to close for this time.  Come if you get this.  As ever until death.                          LOU ELLIOTT."

(4.) Because the court refused to allow counsel for the defendant to read the letter of September 6, 1885, to the witness, Latham, to assist him in identifying it, he having testified that he could not read and that a part of the letter had been read to him.

The motion was overruled, and the defendant excepted.

W. H. HULSEY; BIGBY & DORSEY, for plaintiff in error.

C. D. HILL, solicitor-general, by ELGIN LOCHRANE; REUBEN ARNOLD, for the State.

HALL, Justice.

Irrespective of the other errors assigned upon the charge of the court, we are of opinion that this case is controlled by two questions made in the motion for a new trial, viz:

(1.) That the verdict is without evidence to support it, and is consequently contrary to law.

(2.) Because the court erred in rejecting as evidence a letter, dated September 6, 1885, and forwarded by the party alleged to have been assaulted by the hands of one Latham, who was an illiterate man, and who identified the paper, from certain marks on it, as the one sent by him to the defendant.

Two other letters, which were sworn to be in the same handwriting as that above referred to and sent to the defendant through the mail, were also rejected.  These

letters, written after the prosecution was commenced, were offered to impeach Mrs. Elliott, upon whose person the alleged outrage was charged to have been committed, and who was the witness on whom the State relied to sustain the accusation. There is no doubt as to the foundation being laid to let in the testimony. The court rejected them, solely because he was of opinion that proof of Mrs. Elliott's handwriting was an indispensable prerequisite to this admission, and none was offered by any person who was acquainted with her handwriting. These letters appear in the report of the case, and it is only necessary to remark that their entire tenor and effect was, if not a direct denial of the witness's narrative of the offence as given on the trial, at least an implied denial, so clear and strong as to admit of no contrary deduction or inference. This last named ground of the motion we shall first consider.

1. In the absence of direct evidence of the execution of the paper, it is admissible to resort to proof of handwriting of the party from where it purports to emanate, and in that case, any witness is competent to testify as to his belief, who will swear that he knows, or would recognize the handwriting; but the source of his knowledge is a question for investigation and goes entirely to the weight and credit of his evidence. Code, §3839. We think there was direct proof of the execution of the letter of the 6th of September, 1885; according to the testimony of Latham, he received it from the hands of the witness, with instructions to deliver it to the defendant, he promising to do so, and to let no other person than the defendant see it; he delivered the letter to Smith, the defendant, the morning after he received it, which was the first opportunity he had to hand it to him; at that time, the defendant read a portion of it to him, and he saw a blot upon a certain portion of the writing which enabled him to identify it. It is true that he did not see the letter written, and that the witness did not have time to write after he got to her

house; it was already prepared and she handed it to him; from the signs and marks he observed, he was of opinion this was the same letter handed him by the witness to be delivered to the defendant; he could not be more positive than this upon the point of identity, but he was not at all doubtful as to the fact that he received a letter from the witness at that time, and which, in compliance with her request, he placed in the hands of the defendant. We are of opinion that there was sufficient evidence to carry this letter to the jury, independent of any proof that it was in the handwriting of the witness, although she denied any knowledge of or connection with the transaction. These were questions for the jury; it was their province to determine, not only whether Latham got a letter from Mrs. Elliott to be delivered to the defendant, but whether this was the letter about which he testified. That proof upon the question of handwriting may have been resorted to to corroborate or contradict either Latham or Mrs. Elliott, we think is too manifest to admit of controversy. The court had nothing to do with the credibility of these witnesses, or with the force and effect to be given to their testimony; all he could say was, whether the evidence was competent and was relevant to the point to which it was adduced. We think it was both competent and relevant, and that there was error in rejecting it.

This is said in reference to the letter about which Latham testified; how far it may have been proper to admit other letters offered and rejected, it is not essential to determine; though we are strongly inclined to the opinion that when it was shown to experts, who compared this particular letter with the other, and who believed that they were all in the same handwriting, this was a substantial compliance with section 3840 of the code, which regulates the admission of documents by comparison of handwriting.

2. If the warning caution of Lord Hale, in relation to this particular crime, had been regarded, and the positive

requirements for some corroboration of the evidence of the party outraged, which he lays down, had been considered, we are satisfied that this conviction could not have taken place. In 2 P. C. 290, this great judge and illustrious author says, "But of all difficulties in evidence, there are two sorts of crimes, that give the greatest difficulty, namely, rapes and witchcraft, wherein many times persons are really guilty, yet such an evidence as is satisfactory to prove it, can hardly be found; and on the other side, persons really innocent may be entangled under such presumptions that many times carry great probabilities of guilt. *Tutius semper est errare in acquietando quam in puniendo ex parte misericadiæ quam ex parte justitiæ.*" Again, 1 P. C. 635, this caution is strongly impressed by the observation that "it is true rape is a most detestable crime, and therefore ought severely and impartially to be punished with death; but it must be remembered that it is an accusation easily to be made and hard to be proved, and harder to be defended by the party accused, though never so innocent."

He adds, "I shall never forget a trial before myself of a rape in the county of Sussex. There had been one of that county convicted and executed for a rape in that county before some other judges about three assizes before, and I suppose very justly. Some malicious people, seeing how easy it was to make out such an accusation and how difficult it was for the party accused to clear himself, furnished the two assizes following with many indictments for rape, wherein the parties accused with some difficulty escaped. The instance stated shows the absolute physical impossibility of the accused having committed the offence, although it had been fully proved by the girl and corroborated by the concurrent testimony of both her parents and some others of her relations. This is supplemented by other instances of parties being unjustly and improperly condemned, who, by accidental discoveries, were enabled to make their

innocence appear and to show that the accusation was the result of "malicious contrivance." "I only mention these instances," continues Lord Hale, "that we may be the more cautious in the trial of offences of this nature, wherein the court and jury may with so much ease be imposed upon, without great care and vigilance; the heinousness of the offence many times transporting the judge and jury with so much indignation, that they are over-hastily carried to the conviction of the person accused thereof by the confident testimony sometimes of malicious and false witnesses."

The injured female is usually a competent witness in such cases, but in view of the fatal consequences resulting from relying solely upon her evidence, it is laid down generally that the degree of credit to be given to her evidence depends more or less upon the concurrence of the circumstances of the fact with her testimony. "For instance, if she be of good fame," says our author, *Ib.* 633, if she presently discovered the offence, made pursuit after the offender, showed circumstances and signs of the injury whereof many are of that nature that only women are the most proper examiners and inspectors, if the place where the fact was done was remote from people, inhabitants or passengers, if the offender fled for it; these and the like are concurring evidences to give greater probability to her testimony when proved by others as well as herself.

But on the other side, if she concealed the injury for any considerable length of time after she had an opportunity to complain; if the place where the fact was supposed to be committed were near to inhabitants or common recourse of passage for passengers; and she made no outcry when the fact was supposed to be done, when and where it is probable that she might be heard by others; these and the like circumstances carry a strong presumption that her testimony is false or feigned.

Tested by these rules, which may be considered as well

established, and which are recognized and approved by most of the courts, and especially by this court have they been cited and enforced in many cases (as in *Camp's* case, 3 *Ga.* 417, 420, 421; *Innis'* case, 42 *Ga.* 481; *Johnson's* case, 14 *Ga.* 56, 59, 60, and others cited in Hopkins' Georgia Penal Laws and Supp. §§961, 962, 973, 2192, 2193, 964, 968, 965), the State in this instance made out no case for a verdict of guilty. That the defendant was in pursuit of this woman with a view to cohabit with her, there can be no doubt, and that she was not reluctant to indulge him in the object of his pursuit seems highly probable; it does not appear that she made any "struggle to resist" what she apparently "burned to enjoy." He came to her house on the occasion in question at an early hour of the day, in the absence of her husband; this house was situated on a public road, along which persons were passing, and was within three hundred yards of her brother's house and five hundred yards of her father's residence; when the defendant commenced fondling her, or, according to her account, while he was dragging her to the bed and she was resisting him by holding on to the door, she succeeded in opening the front door and cried out twice as loud as she could, and called her mother ("ma"); he dragged her over the floor, got her on the bed, attempted to raise her clothes, placed his hand on a delicate part of her person; in her struggles she got from under him, and just at this time they saw her sister, a girl of thirteen years of age, coming; this girl came for a tub; Mrs. Elliott, although greatly excited, said nothing to her about what had occurred; she quickly got the tub and returned to her home with it, was not admitted to the bed-room where the alleged fact occurred, but was met and talked to in the dining-room; three hours after this occurred, Mrs. Elliott went to her mother's house and had conversation with her mother, but again made no complaint and made no allusion whatever to what had happened at her own house; when her husband reached home after dark, she told him that defend-

ant had been there in the morning "cutting up," but refused to tell what he did. After the sister had gone, the defendant returned to the house, and she informed him he might come on Sunday and visit her. On that day, she met him and others at Sunday-school, where it was arranged that the company should all go to a singing-school some few miles away; her husband, when consulted, was averse to her forming one of this party; notwithstanding he forbade her to go, she took her seat in the wagon; the defendant sat between her and another young woman, Miss Jennie Latham. On the way, she was playing with him by sticking him with a pin; from the singing they stopped at Miss Latham's house, where she supped with him, and from there they went, at her invitation, to her own house, where they had more singing; this alleged offence was on Thursday; these latter events transpired on the following Sunday. The defendant made no attempt to flee; no pursuit or effort to apprehend him was made during all this time; indeed, no complaint was made on the day of this alleged offence, although there was ample opportunity afforded, if she had desired to do so, both to the sister, to the mother and to the husband when he returned at night; her reason for refraining to make this complaint was utterly frivolous and fallacious, viz., that she feared a difficulty between him and her husband, in which one or the other might be seriously injured; she desired her husband to seek satisfaction by resorting to the courts. There was certainly ample time and opportunity between Thursday and Sunday to have vindicated her wrongs in this way, if such was her motive for withholding a particular and circumstantial account of this affair from her husband and her other relations. If the defendant had attempted to have intercourse with her forcibly and against her will, and in making the attempt had abused her in the shocking manner she described, it is incredible that she should have sought his society on the following Sunday and engaged with him in such diversions and played with him in the manner she

then did, that she should have sought his company and taken pleasure in being with him; this was a mere excuse for concealing her guilty participation with him.   It is significant that her sister was not sworn on this trial and that no effort was made to account for her absence.   So far from acquainting her with what had transpired at the house just before she reached it, there was a plain effort made to cover it up and conceal it.   If the witness did make any outcry at the commencement of this alleged encounter between her and the defendant, it would be no strained presumption to conclude that she did so rather with a view to ascertain if there was danger of discovery than to prevent the threatened wrong, as she would have had the court and jury to believe ; but really, as it seems to an impartial mind from a view of all the facts, she coveted intercourse with the man who had infatuated her, and whom she loved more than she did her husband.   There are additional facts testified to by other witnesses which go far to establish this as the actual relation between these parties, and which not only justify, but would seem to require, the conclusion that she was not averse to, but actually desired and sought, whatever illicit intercourse took place between her and the defendant,—such as her giving him her husband's ring before and allowing him to retain possession of it after this alleged attempt to commit a rape upon her—such as her jealousy, open and avowed, of the woman to whom she believed the defendant was engaged and her declarations that she should never take him away from her.

The entire case does not establish, beyond a reasonable doubt, that defendant made an assault upon her person with an intent to commit a rape ; indeed, its preponderance repels the idea.   The verdict, for the reasons given, should have been set aside and a new trial should have been granted.   On this material point, the record does not disclose even a conflict in the evidence.   There was literally nothing to base the verdict on.

Judgment reversed.