## 4880.  MORROW v. THE STATE.

1. Assuming that the female in this case was mentally capable of giving an intelligent consent to the act of sexual intercourse, the offense proved was no greater than an attempt to commit fornication, without an element of assault with intent to rape.

2. Under the law of this State, sexual intercourse with an infant under ten years of age is rape, as under that age the female is conclusively presumed to be incapable of giving consent, and the man is conclusively presumed to have used force.  Between the ages of ten and fourteen years the law raises a presumption that the female is incapable of giving intelligent assent or dissent to the sexual act, and casts upon the man the burden of overcoming this presumption.  After the age of fourteen years the legal presumption arises that the female is mentally capable of giving consent, and the burden is on the prosecution, when consent is shown, to overcome this presumption.  After the age of fourteen years the question of physical development is relevant only for the purpose of illustrating the question of mental capacity.  The test after this age is mental capacity to understand the sexual act and to give intelligent assent to its commission.

3. On the trial of an indictment for rape, where the female was over fourteen years of age, and the evidence showed that she was neither a lunatic, an idiot, an imbecile, nor afflicted by insanity, and that although weak in mental development, she was nevertheless mentally capable of comprehending and consenting to the sexual act, and did consent to the act, only expressing dissent to its consummation when she saw that she and the accused were discovered in flagrante delicto, that she neither then nor subsequently made any complaint, but afterwards on the same day saw the accused and agreed to meet him on the next day for the purpose of renewing the illicit relations that had been interrupted, the conviction of the accused of the crime of assault with intent to rape was unauthorized by the evidence, and therefore was contrary to law.

RUSSELL, J., dissenting.  There was ample evidence to authorize the jury to find that Lillie Jones was mentally incapable of expressing any intelligent assent or dissent, or of exercising any judgment, in the matter of the sexual intercourse proposed by the defendant.  In my opinion the case is fully controlled by the ruling of the Supreme Court in *Gore* v. *State*, 119 *Ga.* 418, 423 (46 S. E. 671, 100 Am. St. R. 182), and the judgment refusing a new trial should be affirmed.

DECIDED AUGUST 15, 1913.

Indictment for assault with intent to rape; from Haralson superior court—Judge Price Edwards.  April 5, 1913.

Morrow was indicted for rape and was convicted of assault with intent to commit rape.  He made a motion for a new trial, based upon the general grounds and upon numerous special grounds, the overruling of which is assigned as error.  The evidence, substantially stated, is as follows:  The accused was 63 years of age.  The female alleged to have been assaulted was in her fifteenth year.  The

girl gives the following account of the occurrence: "I saw Mr. B. R. Morrow, the defendant in this case, along about January 11, 1913, this year. . . He came down to the mill that week, and told me to be sure to come to town, and he would give me a present. I worked at the mill. . . He told me to come to town Saturday afternoon. The mill closes down on Saturday sometimes half past ten and sometimes eleven. I went to town that afternoon to get some candy and stuff, and he seen me. No one was with me when I went to town. I met up with Mr. Morrow after I got to town. . . He told me to come down Head avenue, he had a nice present for me down there. He kept on and said it was just a little piece; said right down there, the last house. I went down Head avenue; Mr. Morrow went ahead, I don't know how far ahead, just a little piece; I don't know how many feet. When we got down there to the old bridge he went on up in the woods, and I started to turn around, and he made me go on. He took me by the hand and made me go. . I didn't do anything. I was scared of him. He didn't do anything, only held me by the hand and made me go. He didn't do anything until we got down there; then he laid me down. He started to stick his finger up me. I don't know what I mean by 'up me,'—right there [indicating]. Then he didn't do anything until them men come on [the three men who surprised the parties], and I commenced screaming and tried to get away from him. I was lying down. He made me lie down. When he made me lie down I didn't do anything. What I done to keep him from making me lie down, I commenced pushing him, and hollered and cried, and told him I wanted loose. Then he wouldn't let me. He told me just to stay behind, they wouldn't see me, they would go on. Then he didn't do anything, only hold me; I got away from him. . . He was lying down on the ground. He was on his face, his side. I was right against him, under him. I saw him do something with his clothes. He commenced unbuttoning his pants. Then he commenced pulling that thing out. He didn't do anything with it. I got away from him when them men come. He never stuck anything else in me. When I went down there I didn't know what he wanted to do. I thought he had a present down there. When I got up I went up to Mr. Wheeler's, up town. I then went into the drug store and got some ice cream. I don't know what Mr. Morrow tried to do at the bridge."

On cross-examination she further stated: "I went up there with him expecting to get a present. . . I don't know whether I resisted or not. . . The first thing when I got up there he made me sit down. He pulled me down. I was standing up. He was sitting on the ground when he pulled me down. He was holding me before he pulled me down, was hold of me all the time. He had a hold on my hand. . . There was a house on the hill right above us. . . I just sat down there by him. Then the next thing I saw those men were coming. When I saw them coming he had started to do something, had started to do that other thing, had started to put his hand under my dress. I don't know how far away those men were when I first saw them. . . I said, 'There are those men, they are following me from town.' Then I commenced trying to get up. I didn't try to get up before that. I had already lay down; he was right in front of me; he was trying to hide me. . . Mr. Morrow told me they wouldn't see me. Then I got loose and went on. I went a little piece and cut across through the woods, and went in that other way, went in that road. I didn't go back the same way I came. I was not hurt in any way. My clothing was not torn in any way. My clothing was not unbuttoned, disarranged, or anything of that sort. I don't know whether Mr. Morrow and me was good friends or not. I lived in his house. . . After this took place down there this time, I went on back to town, and I saw him again, and had another talk with him there, in Hattie Wheeler's presence. I agreed to meet him again the next day. I was going to meet him over there about the bridge, near our house, the next day, down below. I had met him frequently. . . I didn't tell Hattie anything that had taken place. I went on home that evening. I never told my folks anything about it. The first time I told it was to mama Sunday. I never did tell it until Mr. Pope, the marshal, went down to our house. When he went down there they asked me to tell it before he told it."

Two men testified substantially as follows: They saw the girl and the accused talking together in town, and thought they were fixing to do something, and decided to watch them and to follow them. The accused went on down Head avenue in front of the girl, the girl following on behind; and when they got to the place where they finally stopped, the girl was about a hundred yards

behind him. The witnesses were about forty yards distant, and saw that the accused was lying on top of the girl, in the attitude of having sexual intercourse. He was making no motion, and neither was she. Neither one said anything. "The girl first discovered us and she apparently told the accused of our presence. She made no outcry or anything of that kind, and we heard no cry from any one. On seeing us the girl got up and walked off as quick as she got up. Then the accused went on over the hill. Nothing was said by either one of them. The accused did not have hold of the girl at all on the way down there, but went on in front of her. He did not have hold of her when they turned into the woods. The girl made no outcry, nor did she struggle to get away. We were where we could get a good view. After the occurrence that afternoon we saw the accused and the girl go off to themselves, talking, but we did not hear what they said." ·

The State claimed that the girl alleged to have been assaulted was mentally incapable of consenting to sexual intercourse; that this mental incapacity was known to the accused, and for these reasons the accused was guilty, although no actual force was used by him in the endeavor to accomplish his purpose, and no resistance was made by the female. On the subject of the mental capacity of the girl, the following evidence, in substance, was introduced: Her mother testified that she was in her fifteenth year; that she had been to school in Carroll county about five months; that she started to school when she was eight or nine years old; that she learned to read by the pictures in the book; that she was not bright, and acted around the house like a child eight or nine years old; that she had never had her menstrual periods; that she was forgetful, and did not attend to her work unless her mother got behind her and made her do it; that she would work well when called on to do so; that she could write her name, and that she helped the children in Carrollton. The father testified that the girl was forgetful, had learned to read and spell by heart, had difficulty in learning to tell the time of day. She was permitted to collect her wages from the mill. She had worked for several years in the cotton mill, and the mill boss testified, that she "did not make the best hand in the world," was negligent with her work; that the work she did was spinning; that she ran four sides; that the ordinary hand can run four to six sides, some run two or three; that she was not bright

and was forgetful. There are 128 threads on a side. There is one thread to every spindle. She looked after four sides; and there were at least 100 spindles on a side; she looked after 400 spindles, which would be 800 strands that she kept constantly on her mind. She got 56 cents a day, and sometimes she ran five sides and got more. Her work was never rejected, nor was she turned off for failure to do the work. A physician testified that he had made no examination of the girl to determine as to her physical development, but that he had talked to her and to her parents, and that his opinion was that she was not a normal child of that age, was not able to grasp ideas like other people on various subjects; that she could speak vowels better than consonants; that on some things she was "right bright," and of others she knew nothing at all; he could not state whether any sexual passion had been developed in her; sometimes girls while not developed mentally develop strong sexual passion.

The accused, in his statement to the jury, denied his guilt, saying that he had never in his life had sexual intercourse without the consent of the other party; that when he and the girl left the town Saturday afternoon it was in pursuance of a mutual understanding, for a purpose which she understood as well as he did; that he never pulled her down or used any force whatever, and never consummated the act of sexual intercourse with her that evening; that he had lived in the house with the girl and her parents for a while, and thought that she had as good sense as any girl that he ever saw.

*W. L. Watterson, R. R. Arnold, Griffith & Matthews,* for plaintiff in error.

*J. R. Hutcheson, solicitor-general, M. J. Head, U. G. Brock,* contra.

HILL, C. J. (After stating the foregoing facts).

1. We will first consider the case on the assumption that the girl alleged to have been assaulted was of sound memory and discretion in a legal sense, mentally capable of understanding and consenting to the sexual act, for the purpose of determining if the facts show the commission of the crime for which the accused was convicted. Rape is defined by the Penal Code, § 93, as "the carnal knowledge of a female, forcibly and against her will." This definition is taken from the common law, and the definition is substantially the same in every country where the act is made a crime;

and both the act itself and the attempt to commit it have been visited from the earliest times with the heaviest penalties. To constitute this crime two things must concur: the man must use force to accomplish his purpose, and the act must be without the consent and against the will of the female. Though the man use force, if eventually the woman consent there is no rape; and if the woman does not actually consent, yet if the evidence discloses that the act is not against her will, there is no rape. In what is here said we are confining the discussion to force used to overcome the woman, leaving out of consideration fraud, or any other unlawful means, such as threats, putting in fear, or intimidation of any character. Confining ourselves to this phase of the question, we hold that the act, to constitute rape, must have been done by force against the will or resistance of the female. Her resistance must not be a mere pretext, the result of womanly reluctance to consent to the intercourse, but the resistance must be up to the point where it is overpowered by actual force; and any fact tending to the inference that there was not the utmost reluctance and the utmost resistance should be always received by the jury as illustrating the question as to force. If a female be apprehensive of the purpose of a man to have carnal knowledge of her person, and, remaining conscious, does not use all her powers of resistance and defense, and all her powers of calling others to her aid, and yields before being overcome by greater force, or by fear, or by being surrounded by hostile numbers, a jury may infer that, at some time in the course of the act, it was not against her will. The phrase, "the utmost resistance," is a relative one; the resistance may be more violent and prolonged by one woman than another, or in one set of attending physical circumstances than in another. In one case a woman may be surprised at the onset, and her mouth stopped so that she can not cry out, or her arms pinioned so that she can not use them, or her body so pressed about that she can not struggle. But whatever the circumstances may be, there must be the greatest effort of which she is capable, to foil the pursuer and preserve the sanctity of her person. This is the extent of her ability. *Smith* v. *State*, 77 *Ga.* 705; *Vanderford* v. *State*, 126 *Ga.* 753, 759 (55 S. E. 1025).

Bearing these general principles in mind, let us apply them to the undisputed facts, for the purpose of determining if the crime of

rape was contemplated or attempted by the accused.   The man
goes to where the girl is at work, and invites her to come to town
the following Saturday, so that he can give her a present.   She ac-
cepts the invitation, and on the next Saturday we find her in town,
talking to the man, under such circumstances as led three bystand-
ers to observe their conduct and suspect their purpose.   This fact
alone is significant of a mutual unlawful design.   The man does
not then give her the present, but tells her he will give it to her
in a certain place out of the town, and asks her to go with him
there.   They do not go off together.   If their purpose had been
proper, if she had really thought she was going with the man for
the purpose of getting a present which he desired to give her, they
would have gone away together.   Instead of this, they separate;
he goes and she follows some distance behind.   This separation is
strongly indicative of conscious guilt.   When they reached the
woods near to the point of destination, the man took her by the hand
and made her go.   She does not state that she refused to go or
evinced any reluctance in going, or made any resistance to his
efforts to make her go; nor does she suggest that he used any
force when taking her by the hand in compelling her to go with
him.   On the contrary, she declares that she "did not do any-
thing," but that she was "scared of him."   He did nothing to
arouse her fears or to enforce her obedience.   There were three men
following her and a house stood close by, yet she made no resistance
and uttered no cry for help.   She further says that when they got
down by the "old bridge" "he laid me down," and then took a most
indecent liberty with her person.   Certainly she was then apprised
of the fact that his purpose was not to make her a present, but that
his intention was to commit some offense against her person.   Nev-
ertheless, she made no outcry or resistance to this indecent act of
physical contact with her person.   Her language shows that she
fully understood what the act meant, yet her maidenly modesty
made no protest, and she silently and unresistingly permitted other
suggestive advances towards the consummation of a mutual intent.
While she was lying down, according to her statement, he unbut-
toned his pants and commenced pulling out his private part, and
lay down upon her person, but before the act was consummated
she discovered the near presence of the three men.   She says (and
it is very significant) that just at this particular stage of the pro-

ceedings, observing the presence of the three men, she called the attention of the accused to them, declaring that they had followed her "from town."

Was not the fact that she suspected that these men were following her most significant of conscious guilt? According to her testimony, not until she saw them watching did she cry out and endeavor to get away. But she did not cry out when she got loose, but ran away from those who would have responded to a call for assistance. She makes it very clear that the presence of the three men interrupted further proceedings between her and the accused, and testifies that the accused endeavored to shield her from discovery, and attempted to quiet her fears of discovery, telling her that they had not been seen. Is it not perfectly clear that her perturbation of mind was caused by the presence of the three men, and not by any conduct on the part of the accused? Can there be any rational doubt that it was the presence of the three men that prevented the consummation of the act of sexual intercourse, and not any resistance on the part of the girl? If she had doubted the purpose of the accused up to the time when they reached the place down by the "old bridge," she then became perfectly aware of it. If she had been a virtuous girl, her virtue would then have taken alarm. She would have resisted to the extent of her physical power; she would have made an outcry; she would have called upon the three men who were watching for assistance; she would have gone to them for assistance, and not have gone rapidly away in an opposite direction, so as to avoid recognition. She then goes back to the town, joins a girl friend, makes no statement to the girl friend as to the conduct of the accused, and in a short time thereafter she is seen again talking with the accused, and promises to meet him again, "over there about the bridge." Would she have made the promise, would she have acted in this way, if she had been a virtuous woman, outraged by the conduct of this man? Can there be any other rational interpretation placed upon her conduct, in the light of all these facts, than that this case was not one of assault with intent to rape, but a mutual attempt at fornication, the woman understanding and consenting to the act, and its mutually desired consummation being prevented only by the untimely appearance of the three spying persons? Is it not an absurdity to say, under these facts, that this girl was decoyed to this lonely

place by the promise of a present, and there assaulted by the accused, with felonious intent?

We are not unmindful of the fact that she testified that she did make an outcry and did endeavor to get away from the accused; but these statements as we have endeavored to show, are so at variance with all the facts of the case that they can not be accepted as the truth of the transaction, but must be rejected as a mere pretense and excuse by the girl when she had become aware of the fact that her conduct with the accused had become known. She did not even make complaint to her mother or father when she went home. Her complaint followed the knowledge that the conduct of the accused and herself had been discovered. But why should she have made complaint when she had agreed to give her aged assailant another opportunity of assaulting her? Further, her statement that she made an outcry and endeavored to get away from her lustful assailant can not be believed for another reason. The three men stood within forty yards of the couple. Two of them, testifying for the State, said that the woman made no effort of resistance, that she made no outcry whatever. If she had made an outcry and had made the resistance that she said she did, is it conceivable that these three men would have stood silently by and made no effort to rescue her from the clutches of her assailant? Would they not have rushed to her assistance if they had seen the slightest evidence of any felonious assault upon her person? They regarded the act, as all the facts demonstrate, as being simply the act of a man and a girl mutually indulging in unlawful sexual intercourse or attempting to do so.

It may be said that this question was for the jury. Indeed, it was so said by learned counsel for the State, and so it was; but this court can not assume, under the facts of this case, that the jury, believing the girl to be of sound mind and fully capable of giving consent, made such resistance as indicated that the act intended or attempted by the accused was against her will. The jury must have based their verdict in this case upon the theory that the girl was non compos mentis, and that the accused knew of this fact and took advantage of it, and that it was only necessary to prove that he attempted to have carnal knowledge of her person; that she did not resist because she did not understand the nature and character of the act attempted, and that if she gave any consent it was due to

her mental incapacity to understand the act, and that the attempt to have intercourse with a woman of her mental incapacity, even though no resistance was offered, was equivalent to the use of force.

2-3.  It is well settled that the act of sexual intercourse with a woman who is so destitute of mind as to be incapable of giving consent is rape, though she does not resist.  A learned writer on this subject lays down the following as a test of mental capacity in such cases:  "The test of mental capacity under this rule is whether she was capable or incapable of giving consent or of exercising any judgment in the matter."  Clevenger on Medical Jurisprudence of Insanity, vol. 1, p. 202, and citations.  The learned author adds: "And very slight proof of force is necessary where the woman lacks the intelligence to comprehend the nature and consequences of the act, and to distinguish morally and legally between right and wrong; and when the man does not suppose that he has her consent the force required and which is involved in the carnal act is sufficient.  But where the will is active, though perverted, the act is not rape, when all idea of force or unwillingness is distinctly disproved.  And the mere fact that a woman is weak minded does not disable or debar her from giving consent to the act, and intercourse with her when she was capable of exercising her will sufficiently to control her personal actions is not rape; and if there is reasonable doubt whether force was used, the jury should acquit though the woman was of weak mind.  .  .  The burden of proof of insanity at the time of the act, and that the carnal knowledge was obtained by force and without consent, rests with the prosecution.  There must be. some evidence that she was incapable from imbecility of expressing assent or dissent; and when consent is given from mere animal passion or instinct, it is not rape, and a conviction can not be sustained in the absence of evidence as to her general character for chastity and decency, or anything else to raise a presumption that she did not consent.  Evidence of the connection and the imbecility alone is insufficient."  The Supreme Court, in the case of *Gore* v. *State,* 119 *Ga.* 418 (46 S. E. 671, 100 Am. St. R. 182), quotes with approval this authority, and declares that the test of mental capacity is as follows:  "A man who has sexual intercourse with an imbecile female who is mentally incapable of expressing any intelligent assent or dissent, or of exercising any judgment in the matter, is guilty of rape, though no more

force be used than is necessary to accomplish the carnal act, and though the woman offer no resistance." It has been decided by courts both in this country and in England that in females of diseased mentality, not reaching complete idiocy, if consent is given and no force employed, the crime is not rape, but where a state of idiocy from dementia or imbecility places the woman at the mercy of the ravisher, carnal intercourse is regarded as rape. See cases cited in Witthaus & Becker's Medical Jurisprudence, Forensic Medicine and Toxicology, vol. 2, p. 696. The jury should take into consideration the mental condition of the woman,—whether this mental condition amounts to complete idiocy, or imbecility, or was short of this complete condition,—in determining the question of the guilt of the accused.

Applying the test here laid down by the Supreme Court to the evidence relating to the mental capacity of the woman in this case, does it show that she was mentally incapable of giving consent to the act of sexual intercourse? Before making concrete application of this test to the facts of the case, we will briefly discuss the age of consent under the laws of this State. The Penal Code (1910), § 34, provides that an infant under ten years of age can not be found guilty of any crime; and as the act of sexual intercourse implies the commission of a criminal act, an infant under ten years of age could not be guilty of this offense. In passing, the writer takes occasion to say that in his opinion this age of consent is so low as to be an impeachment of the humanity and civilization of this State. It is a remarkable fact that while in the Southern States a crime against the sanctity of the female person is more severely punished than in any other section of this Union, yet the age of consent in most of the Southern States is much lower than in the other States of the country, except in the State of Delaware, where the astounding and shocking age of consent is seven years, although in that State the age at which a female can be seduced is that of sixteen years. In Georgia, between the ages of ten and fourteen years there is a legal presumption of incapacity to commit a crime, and the burden is upon the State, between these ages, to overcome by clear proof this presumption. Penal Code (1910), § 33. Under the statutes of this State, an infant under ten years can not consent to sexual intercourse, and the fact that such is her age is conclusive that the act is done forcibly and against her will.

*Stephen* v. *State,* 11 *Ga.* 225; *Gosha* v. *State,* 56 *Ga.* 36.  Where
the infant is between the ages of ten and fourteen the legal pre-
sumption is that she can not consent to sexual intercourse; and be-
tween these ages, in determining her capability to consent to carnal
knowledge of her 'person, the jury may consider her physical and
mental development.  *Jones* v. *State,* 106 *Ga.* 365 (34 S. E. 174).
After a female arrives at the age of fourteen, so far as the law is
concerned on the question of mental capacity, she is a normal
woman in full possession of her mental and physical powers.  In
other words, after that time the question of age cuts no figure what-
ever in determining the question of consent; for even after that
age, if the woman is mentally incapable of expressing any intelli-
gent assent or dissent, or of exercising any judgment in the matter,.
sexual intercourse with her is rape, although it may be accomplished
without the use of any force except that which is necessary to ac-
complish the carnal act, and although the woman may interpose
no resistance.  If a woman consents to sexual intercourse after
she reaches the age of fourteen years, and the man is charged with
the offense of rape, the burden is upon the State, in the absence of
any fraud or other unlawful means to procure the consent of the
female to the act, to prove the woman's mental incapacity.  Legally
she is presumed to be capable of giving consent after she reaches
that age.  It is not then a question of physical incapacity 'or lack
of sexual desire on the part of the woman, but the sole question is
one of mental incapacity, and this mental incapacity must reach
the point where the woman is incapable of expressing any intelli-
gent assent or dissent to the sexual intercourse.

Let us now briefly apply to the evidence the rule of law above
indicated, and see if, under the test there laid down, the girl in
this case was mentally incapable of expressing intelligent . assent
or dissent to the act of sexual intercourse.  In the first part of this
opinion, assuming that she was mentally capable, we endeavored
to' show that the only rational conclusion is that she did consent to
the act of sexual intercourse, which was prevented only by the
proximity of the three men and her discovery of their presence.
If we take her own testimony as the truth of the transaction, while
it falls far short of showing such resistance to the act of sexual
intercourse as would make a case of rape, or of attempt to rape,
yet it does show that she fully realized the character of the act

contemplated. Was it an intelligent assent? In other words, was she conscious mentally of the character of the act contemplated? Did she realize that it was wrong? The res gestæ throw a flood of light on this question; and in this light no doubt can be entertained that she was fully conscious of what the accused intended to do, and as fully conscious of the character of the act. In the language of the Supreme Court in the case of *Gore* v. *State,* supra, the sole question to be determined is, whether the facts of the present case bring it within the rule which declares the act to be rape "where the woman is so idiotic as to be incapable of expressing any judgment in the matter;" or whether the girl belongs to "that class of unfortunate females who, while weak-minded, yet possess sufficient mental capacity to comprehend the nature and consequences of the act, and are able to bring to bear that judgment which a woman with that knowledge would exercise." As before stated, the mere fact that a woman is weak-minded does not disable or debar her from giving consent to the sexual act. There must be some evidence that she was incapable, from imbecility, of expressing intelligent assent or dissent.

In our opinion the evidence on this subject, construing it most strongly in support of the verdict, falls far short of proving the girl in this case was an idiot, or an imbecile, or was afflicted with insanity. Indeed, it is not insisted that she is idiotic or an imbecile, or is insane. The utmost extent to which the evidence goes is that she was not a girl of strong mind or of normal intelligence. The evidence shows that she unfortunately had had little opportunity of developing her mind. She belonged to that unfortunate class of children whose parents, either from a lack of means, or from cupidity, or from incapability to appreciate its importance, refuse to give to their offspring the opportunity of developing the intellect. The evidence of her parents is that her educational opportunities had been exceedingly limited; that she had been to school only a short time. Nevertheless, she was able to read, to memorize what she had read, and to write her name. Her mother states that she acted like a child of eight or nine years of age, and that her menstrual period had never come. We attach little importance to the evidence that she had not physically developed. We do not think that the fact of physical development after fourteen years of age is to be considered, except as it may illustrate mental develop-

ment.  The opinion that she acted like a child of eight or nine years of age has little probative value.  The work she did furnishes the most practical and satisfactory proof of capacity.  The evidence shows that this girl had been working for three years in a cotton factory; that she had been earning 56 cents a day, sometimes more. The child was supporting her father's family by her labor.  The boss of the mill testified that while not a bright hand, yet she did her work in a satisfactory manner.  This witness further stated that her work at the cotton mill was spinning; that she ran four sides; that the ordinary hand ran from four to six sides; some only ran two or three; that he had not observed her ways and conduct at the mill, to amount to anything; that at first, it seemed, she was not bright, and was forgetful.  It is true that this witness said also that she was not attentive and neglected her work, and that she seemed to be "not real bright," that she neglected her work; but the work she did in the mill speaks most strongly of her mental capacity, and has far more value than mere opinion.  As before stated, the evidence shows that she ran four sides, 128 threads on a side, one thread to every spindle.  Two ropes come down through the spools, called bobbins, and they are spun together; two strands of rope are put together and spun into one thread and put on the bobbin underneath.  She looked after four sides, with at least 100 spindles on a side,—400 spindles; which would be 800 strands of this roping to be kept in mind.  This work kept her constantly engaged.  She could not have done the work satisfactorily unless she had the power of close attention; and close attention is one of the best tests of mental capacity.  This witness further testified that she not only did this work for which she was paid 56 cents a day, but that sometimes she ran five sides, and that her work was never rejected, and she was not turned off for failure to do the work; that the majority of hands run from four to seven sides.

Testing this girl's mental capacity by her work, we find that she did the work with as much skill and ability as was shown in the work of a majority of those similarly engaged.  Summing up the evidence on this point, the utmost that can be said as to the mental incapacity of the girl is that she was weak-minded or dull.  It can not be said that she was insane or non compos mentis.  No material instance of any exhibition of mental deficiency is given in the evidence, but the testimony shows that she performed the difficult

tasks assigned to her at the mill—tasks that required both responsibility and mentality—in the same manner as others performed them, and that she was paid for her work substantial wages. Her mental development was prevented by the poverty of her parents and by the lowliness of her condition. She was placed at manual labor when she should have been given an opportunity for mental development. Under the facts in this case, this girl is very far from the standard laid down by our Supreme Court in the case of *Gore* v. *State*, supra, as being "so idiotic as to be incapable of expressing an intelligent assent or dissent, or exercising any judgment in the matter." Without discussing this phase of the case further, we conclude that while the accused was guilty of a most shameful act, he was not guilty of the crime of assault with intent to commit rape. We are satisfied that the shameful character of the act, considering the great disparity between the accused and the girl in age and in experience, aroused in the minds of the jurors a natural and altogether laudable sense of indignation, which prevented a calm consideration of the evidence in the light of the well-settled principles of law announced in this opinion.

There are numerous assignments of error as to excerpts from the charge of the court. While the instructions as to mental capacity of the girl were not fully authorized by the evidence, in that they presented to the jury the issue of the girl's imbecility, idiocy, or insanity, without any evidence to authorize such presentation, yet the charge as a whole is a very able presentation of the issues in the case; but in the view that we entertain of the evidence, as fully discussed in the opinion, we have concluded that the verdict is contrary to law, because wholly unauthorized by the evidence; and therefore whether there were any errors in the charge need not be decided.                 *Judgment reversed.*

RUSSELL, J., dissenting. Times without number this court has held that it is without jurisdiction to set aside a verdict approved by the trial judge, if there was some evidence in support of the finding of the jury, and if no material error of law was committed. Adhering to this well-settled rule, I can not consent to reverse the judgment of the trial judge refusing a new trial upon the record now before us. In my opinion there was ample evidence to authorize the jury to find that the injured female was an imbecile, incapable of exercising any will in regard to the attempted

intercourse. If she was mentally incapable of consent to sexual intercourse, such intercourse with her would have been rape, and an attempt to have intercourse would be assault with intent to rape. According to the evidence which the jury had before them, this girl, a little more than fourteen years of age, had never tried to count fifty; her father had tried to teach her to tell the time of the day upon a clock, but she had never been able to acquire even this simple attainment. A physician, testifying as an expert, said she was no more developed than a child eight years of age. The father and mother of the child both testified to circumstances which, in my opinion, fully authorized the jury to conclude that she was an imbecile. Who better than they (if they are credible witnesses) could state the facts? It is true, in stating the conclusion they reached from the circumstances which they detailed, they used no stronger expression than "weak-minded," but the use of this expression is illustrated both by the usual significance of that word in common parlance and by that feeling of commiseration inspired by parental tenderness and a natural disinclination to disclose the affliction of their offspring. I think the jury were fully authorized to find that this child, who had been sent to school three separate times, covering in all a period of more than eighteen months, and yet had not been able to learn all the alphabet,—this child who could not tell the time upon a clock, although her brothers, much younger than herself could do so, and who "read" her books upside down, and whom her parents (dissuaded by affection from using a harsher term) described as "weak-minded," was, in fact and in law, an imbecile. Above all this, the jury saw the girl as a witness; they heard her answers to the questions upon direct and cross examination. The jury had the opportunity of looking into the face, the eyes, and the very soul of the person whose imbecility is at issue in this case, while we can only view it in the cold lines of the transcript of the record.

The defendant had boarded in the house of this child's father. No man knew better than he her weakness. He inveigled her into the disgraceful position in which she was seen by the three young men (if it be assumed that she assented or attempted to assent to illicit intercourse) by the promise of giving her a nice present. This is one version of the case. But what rule of law is there under which it can be held that the jury did not have the right to

believe the testimony of the girl upon this point, and find that she was induced by the promise of a present to go into the woods with the defendant, but that when the crucial moment arrived, when the chastity of her person was to be violated, she resisted to the extent of her limited ability. There is a period of at least five minutes which is covered only by the testimony of the alleged injured female and the statement of the defendant. Why should not the jury have believed her version of what happened during these five minutes, in preference to that of the defendant,—a man of years and experience, whose own admission places him in the disgraceful position of attempting to debauch a child, at best weak and unfortunate, and a member of a family in whose home he had been domiciled. However, without regard to conflicting testimony as to the details of the offense charged, I rest my dissent upon the proposition that the testimony shows that the girl alleged to have been assaulted was in law incapable of consenting to sexual intercourse. It is uncontradicted (unless her appearance before the jury contradicted it) that this girl is no better developed, mentally or physically, than a child of eight years. It is well said, in the opinion of the majority, that the age of consent in this State is so low as to be an impeachment of our civilization. Unquestionably the age of consent in this State should be raised. But what practical protection would be afforded by raising the age of consent, if the law did not in its humanity protect those who, regardless of their age, are, through imbecility, unable to consent? This protection—a defense against their own weakness—our law has ever undertaken to give to that unfortunate class who are of themselves incapable of exercising a rational choice. Even mature women of as little mentality as this girl are protected by law, not only against the animal lust of members of the opposite sex, but against themselves as well; and men who, knowing of their imbecility, take advantage of their helpless condition to gratify lustful propensities are guilty of rape, even if no more force be used than is required to perform the carnal act, and no resistance be offered by the female. To quote the language of the illustrious Chief Justice Campbell, in Regina v. Fletcher, 8 Cox C. C. 248 (L. R. I. C. C. 39): "It would be monstrous to say that these poor females are to be subjected to such violence, without the parties inflicting it being liable to be indicted. If so, every drunken woman, returning from

market, and happening to fall down on the roadside, may be ravished at the will of the passers-by."

One of the most important elements entering into the determination of the girl's imbecility naturally must have been her appearance and demeanor upon the stand. The judge and the jury saw her upon the stand, and we can not put ourselves in the place of the judge and the jury. It is well settled that one may be convicted of rape of a mature woman who fails to resist because of imbecility. This girl was but little more than fourteen years of age, and there was evidence that she was weak in mind. As was said by the Supreme Court in *Gore* v. *State,* 119 *Ga.* 423 (46 S. E. 673, 100 Am. St. R. 182), "The jury are constituted by law the judges of all these matters. They have by their verdict solemnly affirmed that the girl's intellect was so weak that she was incapable of consenting to the act of sexual intercourse, and we do not feel disposed to usurp their functions, and, at this distance, upon a printed record, without ever having seen the girl, declare that we are better judges of the girl's mental condition than the members of the jury were. The trial judge also saw the girl and heard her testimony, and he is satisfied with the verdict."

I am fixed in the opinion that there was ample evidence to authorize the jury to find that Lillie Jones was mentally incapable of expressing any intelligent assent or dissent, or of exercising any judgment in the matter of the sexual intercourse proposed by the defendant, that the case is fully controlled by the ruling of the Supreme Court in *Gore* v. *State,* supra, and that the judgment refusing a new trial should be affirmed.